# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**KENEXA BRASSRING, INC.,**                               )
)
    **Plaintiff,**                              )
)    **Civil Action No.**
    **v.**                                     )    **12-10943-FDS**
)
**HIREABILITY.COM, LLC,**                                 )
**SAPIEN, LLC, HIREBRIDGE, LLC,**                         )
**MAIN SEQUENCE TECHNOLOGY, INC.,**                       )
**QFETCH, LLC, and SENDOUTS, LLC,**                       )
)
    **Defendants.**                             )
_____)

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

**SAYLOR, J.**

This is a patent dispute concerning systems and methods for facilitating the accurate transfer of information from individual users into a structured database—principally, transferring information from individual resumes to a hiring database.  U.S. Patent No. 5,999,939 (the "'939 patent"), held by plaintiff Kenexa BrassRing, Inc., describes a "System and Method for Displaying and Entering Interactively Modified Stream Data into a Structured Form."  U.S. Patent Nos. 6,996,561 (the "'561 patent") and 7,958,059 (the "'059 patent"), also held by Kenexa, each describe a "System and Method for Interactively Entering Data into a Database."  Kenexa has brought suit for infringement of the three patents-in-suit, including allegations of willful infringement and a request for treble damages against three different entities: HireAbility.com, LLC; Main Sequence Technology, Inc.; and Sendouts, LLC.  Defendants have asserted multiple defenses and counterclaims, including assertions of non-infringement and invalidity.

The case is at the claim construction stage. The parties dispute ten terms: (1) "nonuniformly formatted source data streams"; (2) "source data string"; (3) "target data string"; (4) "extracting selected ones of said source data strings"; (5) "user"; (6) "storing data corresponding to said data strings from said form fields into a database"; (7) "enabling said user to modify and/or accept said target data strings inserted within said displayed form"; (8) "supplemental inquiry form"; (9) "remote communication interface"; and (10) "permitting a job applicant to author a resume employing a word processing application."[1]

I. **Background**

A. **Factual Background**

On October 19, 2004, the United States Patent and Trademark Office ("PTO") issued the '939 patent, which claims priority to a provisional application filed on December 21, 1997. On February 7, 2006, the PTO issued the '561 patent, which is a continuation of an abandoned application that was a continuation-in-part of the '939 patent. On June 7, 2011, the PTO issued the '059 patent, which is a continuation of the '561 patent. Each of the patents covers a "system and method for facilitating the accurate entry of information into a highly structured database by initially extracting information" from electronic sources and "subsequent interactions with users" and then "storing the accepted and/or modified information into the database." U.S. Patent No. 5,999,939, at [57] (filed Feb. 6, 1998); U.S. Patent No. 6,996,561, at [57] (filed Sep. 6, 2001); and U.S. Patent No. 7,958,059, at [57] (filed Jul. 28, 2005). Plaintiff Kenexa owns the '939, '561, and '059 patents.

---

[1] The parties initially requested construction of one additional term: "a structured form [comprising/that includes] multiple fields . . . each field being capable of accommodating/accepting a data string." They have since agreed to construe that term as: "a structured form having multiple fields, at least two of the fields being capable of having a data string inserted therein."

Generally, the technology disclosed in the patents is intended for use in the processes of recruiting for and applying to jobs. For example, a job applicant could create and then submit a resume to the system, which would scan and select certain types of information (for example, name, telephone number, prior employer). The system would then present those selections to the job applicant to verify their accuracy or make alterations. In some instances, the system would prompt the applicant to provide more information (for example, willingness to relocate, citizenship, or expected compensation). Finally, the system would store in a database all of the data that has been selected and verified, selected and modified, and added.

The three defendants sell allegedly infringing products and services. Hireability sells products and services under the name "ALEX"; defendant Main Sequence uses the name "PCRecruiter"; and defendant Sendouts uses "Recruiting Solutions" and "New Candidate Registration." Plaintiff alleges that ALEX, PCRecruiter, Recruiting Solutions, and New Candidate Registration infringe, or have infringed, the systems and methods in the '939, '561, and '059 patents. Plaintiff contends that defendants are liable not only for direct or indirect infringement, but also for actively inducing infringement and as contributory infringers.

**B.    Procedural Background**

Kenexa filed the present suit on May 25, 2012. HireAbility and Sendouts answered and filed counterclaims for invalidity and non-infringement on July 20 and October 22, 2012, respectively, and Main Sequence answered and filed counterclaims for invalidity on September 4, 2012. On June 2, 2014, the Court held a *Markman* hearing on the disputed terms in the claims.

### C.    The *Taleo* Litigation

On August 27, 2007, Kenexa commenced a lawsuit in the United States District Court for the District of Delaware against Taleo Corporation and Vurv Technology, Inc., alleging that products sold by the companies infringed the '939 and '561 patents. As part of that litigation, the district court construed some of the claims at issue here in a very brief (two-page) opinion. *See Kenexa Brassring, Inc. v. Taleo Corp.*, 2010 WL 4814673 (D. Del. Nov. 18, 2010). On November 18, 2010, the court found on summary judgment that the accused Vurv products infringed all asserted claims of the patents in suit, and that the accused Taleo products infringed all but three of the asserted claims. The case proceeded to trial in June 2011 on invalidity issues relating to the '939 patent. After the first day of trial, the parties agreed to a settlement, dismissing the remaining claims and counterclaims.

## II.    Legal Framework

The construction of claim terms is a question of law. *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning. The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1313. Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning

relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

## A.    The Words of the Claims

The claim construction analysis normally begins with the claims themselves.[2]  The claims of a patent "define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (citing *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, it is the arrangement of the disputed term in the claims that is dispositive.  "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314.  For

---

[2] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

*Id.* at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another. *Id.* In addition, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

### B.      The Specification

"The claims, of course, do not stand alone." *Id.* Rather, "they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (internal citations and quotations omitted). For that reason, the specification must always be consulted to determine a claim's intended meaning. "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315-1317 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim"). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification. *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is

set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part.").

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323; *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005) (internal quotations omitted). A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect."). "In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323. This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (citing *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

C.      **The Prosecution History**

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning.  The prosecution history consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. *Id.* at 1317.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  *Id.*  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.* (citing *Vitronics*, 90 F.3d at 1582-83).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*  As a result, courts generally require that "a patent applicant [] clearly and unambiguously express surrender of [a] subject matter" to disavow claim scope during prosecution.  *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378 (Fed. Cir. 2005)).

D.      **Extrinsic Sources**

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Phillips*, 415 F.3d at 1317.  It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean."  *Id.* at 1319.  However, extrinsic evidence suffers from a number of defects, including its

independence from the patent, potential bias, and varying relevance.  *Id.* at 1318-19.  Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion.  *Id.* at 1319.

## III.    <u>Motion to Strike</u>

As a preliminary matter, defendants have moved to strike two of plaintiff's exhibits—expert reports by Michael D. Siegel related to the *Taleo* litigation—on the grounds that plaintiff did not identify Siegel as an expert in this case, that his reports do not comply with Fed. R. Civ. P. 26, and that his opinions are not relevant to this case.  Plaintiff contends that it was not required to disclose Siegel as an expert, that his reports comply with Rule 26, and that his reports are relevant extrinsic evidence to the issues of claim construction.  However, regardless of its merits, the motion to strike will be denied on a simpler basis:  defendants failed to consult with plaintiff prior to filing the motion and did not attach to their motion a certification that they had done so as required by Local Rule 7.1.  The motion will therefore be denied, and the Court will consider the exhibits for whatever relevance they may have for purposes of claim construction.

## IV.    <u>Claim Construction Analysis</u>

The proposed constructions of the disputed terms in the '939, '561, and '059 patents are as follows:

| CLAIM TERM | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| "nonuniformly formatted source data streams" | "sets of data that are unstructured relative to a structured database, that vary in format from one set to the next" | "data streams that vary in format from one stream to the next" [but given no weight where term appears in preamble] |
| "source data string" | "a string of text from a source document" | [plain and ordinary meaning] |
| "target data string" | "a string of text based on a source data string and corresponding to a form field" | "data obtained from the source data stream to form a subset of the source data stream" |
| "extracting selected ones of said source data strings" | "identifying and isolating strings of text from a source document [or received resume]" | [plain and ordinary meaning] |
| "user" | [plain and ordinary meaning] | "the person who verifies the accuracy of the target data strings" |
| "storing data corresponding to said strings from said form fields into a database" | [plain and ordinary meaning] | "storing in a database user modified and/or accepted data" |
| "enabling each user to modify and/or accept said target data strings inserted within said displayed form" | [plain and ordinary meaning] | "allowing each user the choice to interactively (i) modify the displayed target data strings, (ii) accept the displayed target data strings, and (iii) modify and accept the displayed target data strings to ensure the accurate transfer of information from said source data streams into the database" |

| | | |
|---|---|---|
| "supplemental inquiry form" | "a form having fields for receiving data in addition to the data actually extracted from the source data stream" | "a form having fields for receiving data from a user (that may be different from or in addition to) the data actually obtained from the source data stream" |
| "remote communication interface" | "network(s) or component(s) that can transfer data between independent computer systems at separate locations" | "a data connection between two or more devices" |
| "permitting a first job applicant to author a resume employing a word processing application" | [plain and ordinary meaning] | "providing an opportunity to a first job applicant to author a resume employing a computer application which includes at least the following features: formatting, editing, and saving" |

## A. **"Nonuniformly Formatted Source Data Streams"**

The term "nonuniformly formatted source data streams" appears in the '939 patent in the preambles of all claims, and in the '561 patent in claims 1 through 6 and the preambles of claims 21 through 36.[3] The use of the term in the following passage from the preamble to claim 1 of the '939 patent is typical: "A method for facilitating the accurate transfer of information from each of a plurality of *nonuniformly formatted source data streams* into a structured database . . . ." '939 Patent col.6 ll.34-37 (emphasis added). That claim then lists steps, including "supplying digital data representing each of a plurality of source data streams from a plurality of users, each said source data stream containing data corresponding to multiple discernible source data strings." *Id.* col.6 ll.39-42. As to the use of the term in the body of a claim, the following passage from the body of claim 1 of the '561 patent is typical:

A method for facilitating the accurate transfer of information to a structured

_____

[3] Claims 2 through 6 are dependent claims that incorporate by reference the language of claim 1.

database, said method comprising steps of: (a) receiving digital data from one or more users representing one or more *nonuniformly formatted source data streams*, each said source data stream containing digital data corresponding to one or more discernible source data strings . . . .

'561 col.8 ll.45-52 (emphasis added).

Defendants propose that the term, where it appears in the body of the claim, be construed as "data streams that vary in format from one stream to the next." They cite the specification of the '561 patent, in part for its citation of "a document/file" as exemplary of a "source data stream" and its explanation that "resumes are generally nonstructured or loosely structured (and nonuniformly formatted between users) text documents . . . ." '561 Patent col.1 ll.41-42, col.3 ll.44-46. They also look to the prosecution history, during which the Board of Patent Appeals and Interferences ("BPAI") suggested that "nonuniformly formatted" data refers to diversity among the user-provided documents. (Def. Mem., Ex. V, at 8-9). Defendants contend that the nonuniformity should not be defined as relative to a structured database, as plaintiff proposes. Defendants further contend that the term as it appears in the preamble to the claims should not be construed, because preambles are merely statements of intended use and therefore not limiting.

Plaintiff proposes that the term be construed as "sets of data that are unstructured relative to a structured database, that vary in format from one set to the next," both in the body of the claim and in the preamble. Plaintiff contends that the term's use in the preamble is a limitation that helps to define the claimed invention and provides an antecedent for the term "source data streams" in the body of the claims. To arrive at its proposed construction, plaintiff relies on the specification and cites the ruling of the Delaware district court in *Taleo*, which construed the term as follows:

"Nonuniformly formatted source data streams" . . . means that each resume ("data stream") may be different with respect to the ordering of data contained therein.

. . . The format of the data within the stream must vary, i.e., the first sentence of the first stream may contain an address whereas the first sentence of the second stream may contain a name. However, the file types that make up the data streams may be the same, that is, the resumes may all take the form of Microsoft Word documents.

*Kenexa Brassring, Inc. v. Taleo Corp.*, 2010 WL 4814673 (D. Del. Nov. 18, 2010).[4]

Both parties ask the Court to construe the disputed term where it appears within the body of claims (specifically, in claims 1 through 6 of the '561 patent). The construction inquiry can be broken down into two parts: the meaning of "nonuniformly formatted" and the meaning of "data streams."

First, the parties agree that "nonuniformly formatted" means that the "source data streams" may "vary in format." Their disagreement centers on whether the definition should include the additional limitation of being "unstructured relative to a structured database," as plaintiff proposes. That further limitation finds little support in the claim, the specification, or other available sources. Claim 1 recites "a structured database," but does not compare the "source data streams" to the database. The key comparison that the specification makes about the data concerns the variety of formatting between users. *See* '561 Patent col.1 ll.41-42, col.3 ll.44-46 ("[R]esumes are generally nonstructured or loosely structured (and nonuniformly formatted *between users*) text documents . . . .") (emphasis added). The claimed invention clearly presumes that the preexisting data streams are less structured than the data processed through the claimed invention and stored in a database, and the specification mentions that a

---

[4] While the claim construction of one court is not binding on another, a court may consult "the claim analysis of different district courts on the identical terms in the context of the same patent" "in the interest of uniformity and correctness." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1329 (Fed. Cir. 2008). *See Iovate Health Sciences, Inc. v. Allmax Nutrition, Inc.*, 639 F. Supp. 2d 115, 124 (D. Mass. 2009) (giving "reasoned deference" to the construction of a prior court construing the same patent and adopting that court's interpretation).

"resume" drafted by a user "is *generally* unstructured relative to the highly structured form of the database." *Id.* col.5 ll.14-15 (emphasis added). The use of the word 'generally' implies that this relation is not universal. Thus, adding the additional comparative phrase as a limitation appears unnecessary as well as unhelpful to the jury. Accordingly, the Court will construe "nonuniformly formatted" as "vary in format from one stream to the next" without the additional qualification of "unstructured relative to a structured database."

Second, plaintiff proposes a construction of "data streams" as "sets of data," whereas defendant proposes just "data streams" (that is, the ordinary meaning of the term). On the one hand, it is unlikely that a layperson could easily use or define the term "data streams" in this technical context, and therefore construction could be helpful to the jury. On the other hand, the term "sets of data" is not much clearer—and could result in confusion if the term "audio streams" must then be construed as "sets of audio." As noted, the Court is not required to provide additional language construing a claim if its ordinary meaning can be readily understood by a layperson and adopting it would resolve the parties' dispute concerning interpretation. *See O2 Micro*, 521 F.3d at 1361. The specification provides an example of a "source data stream" as a "document/file." '561 Patent col.1 ll.42-43. That example alone may likely be sufficient to illuminate for a jury the meaning of "data stream" as used in the '561 patent. Accordingly, the Court will not construe the term "data streams."

The parties disagree as to whether the Court should construe the disputed term where it appears in the preamble to claims. Generally, a preamble to a claim serves as a limitation on that claim only where it "recites essential structure or steps" or "is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305

(Fed. Cir. 1999)).  For example, a preamble may be limiting if the claim depends on it "for antecedent basis," if it "is essential to understand limitations or terms in the claim body," or if it is "necessary to give life, meaning, and vitality to the claim."  *Catalina Mktg. Int'l*, 289 F.3d at 808 (internal quotation marks omitted).   On the other hand, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."  *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).  *See American Medical Systems, Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358-59 (Fed. Cir. 2010) ("A preamble is not regarded as limiting, however, when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.").

Defendant points out that the relevant patent claims do not appear to refer back to the term "nonuniformly formatted source data stream" as an antecedent.  In claim 1 of the '939 patent, for example, the first use of "source data stream" stands alone; the claim does not refer to "*said* source data streams" or "*such* source data streams."  The second use of the term *is* preceded by the word "said," but that indicates only a reference back to the prior use of "source data stream" within the claim itself.  Accordingly, the "antecedent basis" portion of the *Catalina* test does not compel the Court to construe "nonuniformly formatted source data streams" where it appears in the preamble to a claim.

However, a strict linguistic analysis does not end the inquiry.  Terms in a preamble must also be construed if they are "essential to understand limitations or terms in the claim body" or "necessary to give life, meaning, and vitality to the claim."  *Catalina Mktg. Int'l*, 289 F.3d at 808 (internal quotation marks omitted).  Here, the ability of the claimed inventions to transfer data into a structured database from source data streams that are *nonuniformly formatted* is an

15

essential aspect of their utility. Nonuniform formatting is not a coincidental feature of the relevant data streams; instead, the variations in formatting must be accounted for in order to successfully transfer data into a structured database, as the inventions claim. The specification of the '939 patent gives one example when it explains that the data extractor can standardize the format of dates listed on resumes. '939 pat., col. 3, ll. 62-67 ("For example, a date text string could be standardized (e.g., March 12, 1993 could be changed to 3/12/93)."). In this respect, the modifier "nonuniformly formatted," where it appears in the preamble, is essential to understand, and necessary to give meaning to, the claims. Accordingly, it should be construed in the same manner as where it appears in the claims.[5]

In sum, the Court will adopt the construction of "nonuniformly formatted source data streams" as "data streams that may vary in format from one stream to the next." This construction applies both where the term appears in the body of the claims and where it appears in the preamble to a claim.

B.      "Source Data String"

The term "source data string" appears in all claims of the '939 patent, claims 1 through 6 of the '561 patent, and claims 1 through 6 and 20 through 23 of the '059 patent. Its use in claim 1 of the '939 patent is typical:

> supplying digital data representing each of a plurality of source data streams from a plurality of users, each said source data stream containing data corresponding to multiple discernible *source data strings* . . . .

'939 Patent col.6 ll.38-41 (emphasis added). Claim 1 in each of the patents later instructs to

---

[5] To the extent that the question remains close, the Court notes that construing the term in the claims, but not in the preambles, would be somewhat difficult in practice to implement. While this reason standing alone may not be enough to compel construction of the term in the preamble, it nonetheless counsels in favor of construing it.

extract "source data strings" from source data streams, generate "target data strings" from them, and insert the "target data strings" into the fields of a structured form.  For example, a resume authored by Jane Doe would likely include her first and last names.  "Jane" and "Doe" would each be a "source data string" selected from the resume (the source data stream) under the claimed invention.

Plaintiff proposes to construe "source data string" as "a string of text from a source document," relying on both the claims themselves and the specifications.  Alternatively, it suggests "file" or "source data stream" in place of the word "document."  Plaintiff quotes the '939 patent specification, and identical portions of the other patents, that describe how (in one step of the claimed invention)

> the data extractor isolates one or more discernible source data strings, e.g., text data strings, within the resume and, according to the context of the source data strings . . . and using the syntax of the surrounding keyword data, e.g., text strings, determines a correlation between source text strings and data fields that are to be entered into the database.

'939 Patent col.3 ll.23-29.  Plaintiff therefore contends that "'source data strings' are simply strings of text *in raw form* that are extracted from a source document."  (Pl. Mem. at 10) (emphasis in original).  It also submitted excerpts from multiple technical dictionaries and resources that define "string" as text.  *See Microsoft Press Computer Dictionary* 72, 374 (2d ed. 1994) (defining "string" as a "data structure composed of a sequence of characters, usually representing human-readable text"); *Dictionary of Computer Words:  A Helpful Guide to the Language of Personal Computing* 243 (1993) ("A set of consecutive characters treated by a computer as a single unit.  Computers can perform operations on text by treating words as strings.  Also called character string.").

Defendants propose that "source data string" should be given its plain and ordinary

meaning, and therefore offer no construction of the term. They contend that plaintiff's construction of "data string" is overly narrow, because it limits data to text form; inconsistent, because the patent uses "source text strings" in the context of text-based examples; and illogical, because if the specification lists "text strings" as one example of a "source data string," then some source data strings must not be text strings. And they contend that plaintiff's construction of "source" to mean "document" is too narrow, because the patent offers "documents" and "files" as examples of "sources," but also contemplates that "audio streams" and "audio files" could be "sources." *See* '561 Patent col.2 ll.20-25, col.6 ll.52-54, col.6 ll.63-64.

Contrary to defendants' assertion, the term "source data string" is not so clear as to be obvious in meaning to a jury. Presumably, therefore, it would be helpful to construe the term in plainer English. Yet plaintiff's construction is far from satisfactory. For example, plaintiff finds it necessary to cite technical dictionaries for the meaning of "string," but uses that word in its proposed construction. As defendant points out, the patents define "sources" more broadly than "documents," and plaintiff's construction is therefore unduly narrow.

As to the issue of whether a "source data string" is properly limited to text, the patents do appear somewhat inconsistent in their use of the word "data" versus the word "text," as defendants point out. However, read as a whole, the specifications clearly imply that "source data strings" are necessarily in text form. For example, the claimed invention displays the source data strings to the user within a form, from which it must be inferred that human users can read and alter the strings. Even where the '561 specification discusses audio streams as potential sources, it provides that the audio streams must first be converted to text in order to be processed. *See* '561 Patent col.2 ll.20-25. Moreover, the computer dictionaries cited provide additional support for the proposition that "strings" are commonly and usually understood as

being "text" by those skilled in the art.

Accordingly, the Court will construe "source data string" as "a string of text from a source data stream."

## C.    **"Target Data String"**

The term "target data string" appears in claim 1 of the '939 patent, claims 1, 21, and 24 through 34 of the '561 patent, and claims 1, 20 through 22, 24, 26, 30, and 32 the '059 patent. Its use in claim 1 of the '939 patent is typical:

> processing said digital data for extracting selected ones of said source data strings and generating related *target data strings* . . . .

'939 Patent col.6 ll.42-44 (emphasis added).

Plaintiff proposes that "target data string" means "a string of text based on a source data string and corresponding to a form field," or alternatively "a string of text based on a source data string and corresponding to a database field." It cites the given examples in the specifications that source data strings that correspond to dates would be altered to appear in a uniform format. In other words, a source data string containing a date could be in a variety of forms (for example, "February 6, 1998," "Feb. 6, 1998," "2/6/98"), but the claimed invention would convert any of those forms to a "target data string" in a single format (for example, "2/6/1998"). Plaintiff asserts that the specifications further support the construction that a "target data string" must relate to both a "source data string" emanating from the "source data stream" and a field in the form displayed to the user. Defendants' proposal, they contend, excludes the preferred embodiment by removing any distinction between source and target data strings.

Defendants propose to construe "target data string" as "data obtained from the source data stream to form a subset of the source data stream." They again challenge the argument that

19

a "data string" need not be text, and they also read together different sections of the patents to conclude that a "target data string" is necessarily a "subset" of a "source data string." Defendants further contend that a "target data string" does not need to correspond to a form or a field. To support this contention, defendants point out that the concepts of "form" and "field" are added in dependent claims (indicating that the drafter did not incorporate a "form" or "field" into the definition of a "target data string"), and that the specification implies that a corresponding form or field is not necessary for generation of a "target data string."

For the reasons stated above, and to maintain consistency throughout the patent, it is clear that a data string should be defined as a "string of text." The issue, if any, is how to describe that text. Defendants' proposal seems both confusing and unsupported by the patents themselves. For example, the "target data strings" are not part of the "source data stream"; they are generated by the processing of portions of that data. However, defendants rightly point out that not all claims employ fields, whether in forms or databases, to display them to users. If that is the case in a particular claim, the patents so explain, and it therefore appears unnecessary for purposes of jury understanding to add that qualification.

Accordingly, the Court will construe the term "target data string" as "a string of text based on a source data string."

### D. "Extracting Selected Ones of Said Source Data Strings"

The phrase "extracting selected ones of said source data strings" appears in claim 1 in all three patents. Claim 21 of the '561 patent uses the related phrase "extracting data strings," and claim 24 of the '059 patent uses the phrase "extracting data strings from the received resume." For example, claim 1 of the '561 patent states, in part,

*extracting selected ones of said source data strings* from said source data streams

and generating related target data strings . . . .

'561 Patent col. 2 ll.20-25 (emphasis added).

Plaintiff's proposed construction is "identifying and isolating strings of text from a source document" or (for claim 24 of the '059 patent) "identifying and isolating strings of text from a received resume." It notes that the specifications explain that the data extractor "isolates one or more discernible source data strings . . . within a resume" but that the extractor "is susceptible to making incomplete or erroneous correlations . . . ." '939 Patent col.3 ll.22-25, col.3 ll.10-18. Accordingly, plaintiff contends that the step of extraction is distinct from the step of creation of a target data string.

Defendants contend that no construction of the phrases is necessary. However, they again take issue with plaintiff's interpretations of "string" as "text" and of "source data streams" as "documents," both of which they assert are too narrow. Furthermore, they contend that the specification discloses a "data extractor," citing as an example the publicly known DEFT text data extraction software system, which does more than "identify" and "isolate"; it can also "selectively convert information from the format of the unstructured (or loosely structured) resume to the format of the highly structured database." '939 Patent col.3 ll.19-22.

To maintain uniformity of interpretation, the Court will consistently construe the term "source data string" across the patents as "a string of text from a source data stream." The remaining questions are whether any construction of "extracting" is necessary and, if so, what that construction should be.

The plain language of the claims makes clear that "extracting" and "generating" are separate operations. The specifications do describe a data extractor as conducting both operations, but the shared root of the words "extractor" and "extracting" is not controlling.

Instead, the extractor appears to accomplish both steps, which, in any event, the relevant claims include in a single step of "extracting . . . and generating." '939 Patent col.6 ll.43-44. Plaintiff's proposal as to the word "extracting" therefore appears appropriate, and accordingly, the Court will adopt the construction of "identifying and isolating."

In sum, the phrase "extracting selected ones of said source data strings" will be construed as "identifying and isolating strings of text from a source data stream"; the phrase "extracting data strings" will be construed as "identifying and isolating strings of text"; and the phrase "extracting data strings from the received resume" will be construed as "identifying and isolating strings of text from the received resume."

**E.** **"User"**

The term "user" appears in claims 1 and 4 of the '939 patent, claims 1, 4, 29, and 34 of the '561 patent, and claims 20, 23, and 32 the '059 patent. Claim 1 of the '939 patent recites, for example,

> supplying digital data representing each of a plurality of source data streams from a plurality of *users* . . . ;

> enabling each *user* to modify and/or accept said target data strings . . . .

'939 Patent col.6:39-40, 6:50-51(emphasis added). And claim 20 of the '059 patent recites,

> receiving . . . digital data from one or more job applicants . . . ;

> enabling said first job applicant to modify and/or accept said target data strings inserted within said structured form . . . ;

> enabling . . . a *user* to access at least a portion of said target data strings modified and/or accepted by said first job applicant . . . .

'059 Patent col.11 ll.7-33 (emphasis added).

Plaintiff proposes that the plain and ordinary meaning of "user" is sufficient. Defendants

propose that "user" means "the person who verifies the accuracy of the target data strings." Defendants' proposal, however, appears to contradict claim 20 of the '561 patent, which clearly distinguishes the person who verifies the accuracy of the target data strings, labeled the "job applicant," from the "user," who accesses target data strings verified by the job applicant. That proposal must therefore be rejected

Defendants urge that some construction of the term is necessary. They further contend that plaintiff asserted during the prosecution that a "user" is the "author" of the source data stream. Notably, plaintiff has not pressed that argument here, which in any case appears inconsistent with the relevant claims. Instead, plaintiff points out that each of the claims at issue specifies the activity or activities in which the user engages, and therefore the term can be easily comprehended by a lay person. The Court agrees. Again, if the ordinary meaning of a term can be readily understood by a layperson and adopting it would resolve the parties' dispute concerning interpretation, there is no requirement that a court provide additional language construing a claim. *See O2 Micro*, 521 F.3d at 1361. Accordingly, the Court will adopt the plain and ordinary meaning of the term "user."

F. **"Storing Data Corresponding to Said Strings from Said Form Fields into the Database"**

Claim 1 of the '939 patent concludes with the steps of

enabling each user to modify and/or accept said target data strings inserted within said displayed form corresponding to said source data stream originating from said user; and

*storing data corresponding to said strings from said form fields into the database*.

'939 Patent col.6 ll.54-55 (emphasis added).

Plaintiff contends that no construction is necessary. Defendants present a proposed

construction of "storing in a database user modified and/or accepted data," and assert that the "storing" step must be undertaken after the "enabling . . . to modify and/or accept" step. The inquiry as to the first question is essentially whether it is helpful and appropriate to construe "data corresponding to said strings from said form fields" as "user modified and/or accepted data."

Defendants contend that the claim is otherwise ambiguous, because "said strings" could refer to other "strings" mentioned earlier in the claim. And they assert that during reexamination of the '939 patent, plaintiff's predecessor, BrassRing, distinguished the claimed invention from the prior art of storing extracted data in a database by emphasizing that the extracted data had been edited. Plaintiff responds that defendants' proposal is redundant because the claim earlier teaches that the data must be modified and/or accepted.

To be sure, the patent's repeated use of the word "said" renders the claim slightly confusing. However, in context, the meaning is clear that the data stored in the database has been modified and/or accepted because the step immediately prior so states. Construction of the term is neither helpful nor necessary, and accordingly, the Court will not construe the terms beyond attributing to them their ordinary meanings.

The next question is whether the "enabling" and "storing" steps must be completed in that order. A patent generally should not be read to require a particular ordering of steps unless the claim and its context clearly establish that such an order is required. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."). Whether a method claim requires a particular order depends on whether (1) the claim language so dictates, "as a matter of logic and grammar," and (2) if not, whether the claim "directly or implicitly

24

requires such a narrow construction." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003) (quoting *Interactive Gift*, 256 F.3d at 1343).

Here, claim 1 of the '939 patent appears to require that the "storing" step be performed after the "enabling" step. The claim repeatedly uses the word "said" to refer to previously listed items. For example, the "displaying" step introduces a structured form, and the "storing" step refers to "said form fields." The claim describes a method to process a source data stream, extract source data strings, generate target data strings, and then perform various operations on "said" target data strings—with each "said" logically (and grammatically) referring to the immediately prior use. *See E-Pass Technologies, Inc. v. 3Com Corp*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (requiring steps be performed in order "because the language of most of the steps of its method claim refer to the completed results of the prior step"). Furthermore, a claimed purpose of the patent is providing accurate data, and as a matter of logic, it makes sense that the data ultimately stored in the database has undergone modification or acceptance. Accordingly, the Court will construe the claim so as to require that the "enabling" step precede the "storing" step.

G.      **"Enabling Each User to Modify and/or Accept Said Target Data Strings Inserted within Said Displayed Form"**

Claim 1 of the '939 patent states, in part,

displaying a structured form comprised of multiple fields, each field being capable of accommodating a data string and wherein one or more of said fields have said target data strings inserted within;

*enabling each user to modify and/or accept said target data strings inserted within said displayed form* corresponding to said source data stream originating from said user . . . .

'939 Patent col.6 ll.46-54 (emphasis added). Claim 1 of the '561 patent and claim 1 of the '059

patent similarly provide for "enabling" "said first user" or "said first job applicant" to "modify and/or accept" "target data strings."

Defendants propose to construe the term as follows: "allowing each user [or the first user or the first job applicant] the choice to interactively (i) modify the displayed target data strings, (ii) accept the displayed target data strings, and (iii) modify and accept displayed target data strings to ensure the accurate transfer of information from said source data streams into the database." Citing the specification, defendants contend that "and/or" is indefinite and therefore confusing; that "enabling" means "allowing" to make a "choice" and necessarily involves interactivity; that "and/or" requires a "choice"; and that the purpose of the claimed invention as a whole is to ensure accurate data transfer from sources to databases. Plaintiff again contends that no construction is necessary and that defendants' proposal unnecessarily reads limitations into the claims and is overly complex.

As to defendants' proposal to break out the "and/or" into its component parts, that appears unnecessary and cumbersome. The phrase is commonly used and understood. The concision of the original phrase is preferable to the clunky, if somewhat more precise, text of the proposal.

As to the proposal to construe "enabling" as "allowing . . . the choice to interactively [modify and/or accept]," that, too, appears unnecessary. "Enabling" may mean "allowing," but the shared definition alone is not a reason to substitute a synonym for a word that was chosen by a patent's drafters and is easily comprehended by a layperson. Likewise, the claimed invention impliedly involves interactions between a human user and a system, but inserting "interactively" into the claim appears unwarranted.

Finally, and on similar grounds, the addition of a purposive statement about "accurate

transfer" is unnecessary.

Again, a court may not import limitations into the claims that have no basis in the language of the claims themselves, whether those limitations come from the specification or from some other extrinsic source. *See Phillips*, 415 F.3d at 1323 (holding that courts must not "import[ ] limitations from the specification into the claim"); *see also DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) (reversing claim construction where a district court "improperly read into [the claims] a new limitation not required by the claim language"). And no construction of a term is necessary where a layperson can readily understand the claim language and adoption of the ordinary meaning of the term will resolve the parties' dispute. *See O2 Micro*, 521 F.3d at 1361. Such is the case here. Accordingly, the Court will adopt the ordinary meaning of the phrase "enabling each user [or said first user, or said first job applicant] to modify and/or accept said target data strings inserted within said displayed form."

### H. "Supplemental Inquiry Form"

The term "supplemental inquiry form" appears in claim 6 of the '939 patent and claim 6 of the '561 patent. Its use in the '939 patent is one example:

The method of claim 1 additionally comprising the step of:

supplying one or more supplemental data strings in response to a *supplemental inquiry form*; and wherein

said displayed structured form additionally displays fields having said supplemental data strings inserted within.

'939 Patent col.7 ll.1-6 (emphasis added).

Plaintiff proposes that the term be construed as "a form having fields for receiving data in addition to the data actually extracted from the source data stream," which was the construction

adopted in the *Taleo* case. *See Kenexa Brassring v. Taleo Corp.*, 2010 WL 4814673, at *1 (D. Del. Nov. 18, 2010). Defendants, in turn, propose the term be construed as "a form having fields for receiving data from a user (that may be different from or in addition to) the data actually obtained from the source data stream." Both base their arguments on the specifications and the claims themselves. They primarily disagree on two issues: (1) whether the supplemental data may be "different from" the data taken from the source data stream, and (2) whether the construction must specify that the supplemental data is "from a user."

Plaintiff contends that the supplemental data cannot be "different" from the data taken from the source in the sense that it cannot contradict that data. In other words, plaintiff contends that the supplemental inquiry form does not ask for information, whether the same or different, that has already been obtained. On that basis, plaintiff argues that defendants' proposal blurs the distinction between the supplemental inquiry form and the structured form in which target data strings may be modified and accepted. Defendants' proposal, on the other hand, uses "different" to mean that the supplemental inquiry form seeks additional information—in other words, information that the earlier extraction step did not obtain. The parties therefore largely agree that the supplemental inquiry form (1) does not seek the same information already obtained and (2) does not accept information contradictory to the previously extracted data. To capture that understanding, the insertion of the phrase "in addition to" appears sufficient.

As to the second question, plaintiff notes that the claims often specify where data is submitted by a "user," but the specific claims at issue do not. *See, e.g.*, '561 Patent col.8 ll.49 ("receiving digital data from one or more users . . ."); *id.* col.8 ll.65 ("receiving digital data from said first user . . ."). Defendants respond that the specification provides that the supplemental inquiry form "asks the user one or more supplemental questions" and "[i]n response, the user

fills in supplemental fields." '939 Patent col.7 ll.1-6. While a sensible reading of the claims in light of the specifications suggests that the user enters the supplemental information, ultimately the language of the claim must control. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[A] claim construction analysis must begin and remain centered on the claim language itself . . . ."). Thus, the Court will not include the "from a user" limitation in its construction of the term "supplemental inquiry form."

As a final matter, plaintiff uses the word "extracted" and defendants use the word "obtained" to describe the data taken from the source data stream. Because "extracted" has been separately construed in connection with a different term, the better construction here is to adopt the word "obtained."

Accordingly, the Court will construe the term "supplemental inquiry form" as "a form having fields for receiving data in addition to the data actually obtained from the source data stream."

I.      **"Remote Communication Interface"**

The term "remote communication interface" appears in claim 2 of the '939 patent, claims 2, 22, and 35 of the '561 patent, and claims 1, 20, 24, and 32 of the '059 patent. Selected portions of claim 1 of the '059 patent are typical:

> receiving, via a *remote communication interface*, digital data from a plurality of job applicants . . . ;
>
> sending, via said *remote communication interface*, a structured form to said first job applicant . . . ;
>
> receiving, via said *remote communication interface* in response to providing one or more inquiry forms, one or more data strings from said first job applicant . . . .

'059 Patent col.8 ll.43-9:7 (emphasis added). An example of a "remote communication

interface" provided in the '059 specification is the combination of the Internet, the hardware, and software at the user and database service provider sites (such as a computer modem and web browser), and the connections between the user and those sites, such as phone lines and Internet Service Providers. *See id.* col.4 ll.58-63. Alternative examples are local area networks or direct modem-to-modem or serial port-to-serial port connections. *See id.* col.4 ll.64-67.

Plaintiff initially suggested that the plain and ordinary meaning of the term should be adopted, and defendants proposed "a component or components that enable two different devices (which may be but is not required to be within the same computer network) to communicate with one another." However, after oral argument, the parties submitted new proposed constructions and supplemental briefing.

Plaintiff now proposes that the Court construe the term "remote communication interface" to mean "network(s) or component(s) that can transfer data between independent computer systems at separate locations." To support its argument that the term encompasses both geographic and operational separateness, plaintiff relies on the specifications and on contemporary technical dictionaries. *See Microsoft Press Computer Dictionary* 103, 257, 405-06 (2d ed. 1994) (defining "communications," in part, as "data transfer from one computer to another through a communications medium, such as a telephone, microwave relay, satellite link, or physical cable"; "interface," in part, as the "point at which a connection is made between two elements so that they can work with each other"; "remote" as "[n]ot in the immediate vicinity, as a computer or other device located in another place (room, building, or city) and accessible through some type of cable or communications link"; and "remote communications" as "[i]nteraction with a remote computer through a telephone connection or another communications line"); *Dictionary of Computer Words: A Helpful Guide to the Language of*

*Personal Computing* 128-29, 219 (1993) (defining "interface" as the "devices, graphics, commands, and prompts that enable a computer to communicate with any other entity, such as a printer or the user . . ." and "remote" as "[c]ontrolled, operated, or used from a distance, as by modem or over cables").  Plaintiff also notes that other claims in the patents contain the term "communication interface" without the requirement that it be "remote."

Defendants propose the construction "a data connection between two or more devices." Relying on the specifications, they assert that a "remote communication interface" need not involve the Internet and that it does not require any particular physical distance between devices. They also contend that the BPAI, during the '561 patent *inter partes* reexamination, found that the step of transmission of data to remote devices was disclosed in, or rendered obvious by, the prior art.

Neither of the newly proposed constructions captures the full meaning of the term. Defendants' proposal fails to include any interpretation of the word "remote."  Claim construction must account for each and every component of a term.  *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").  Plaintiff's proposal, however, puts too much emphasis on the distance and separation.  By describing the computer systems as "independent" as well as in "separate locations," plaintiff's construction appears to contradict the specification, which describes a Local Area Network as a possible "remote communication interface."  Such networks typically exist within a smaller, confined area, such as an office, building, or campus, and the computer systems are not entirely "independent" of one another.

Ultimately, a modified combination of the two proposals appears most appropriate to fit the claims and specifications.  The Court therefore will construe the term "remote

communication interface" to mean "one or more component(s) that can transfer data from a distance between two or more computers or computer systems."

J.    **"Permitting a First Job Applicant to Author a Resume Employing a Word Processing Application"**

The term "permitting a first job applicant to author a resume employing a word processing application" appears in claims 24 through 33 of the '059 patent. Claim 24 presents a typical use:

> A method for facilitating the accurate transfer of resume information from a source data stream to a structured database, said method comprising:
>
> *permitting a first job applicant to author a resume employing a word processing application*;
>
> permitting the first job applicant to transmit the resume electronically to a processing computer system from the first job applicant's computer system . . . .

'059 Patent col.11 ll.52-59 (emphasis added). The specification gives Microsoft Word as an example of a "word processing application." *Id.* col.5 ll.26-27.

Plaintiff contends that the plain and ordinary meaning of the term suffices, and suggests that defendants are attempting to read limitations into the claims. Alternatively, it proposes that, if construction is needed, the term means that the invention is configured to accept a resume that was created using a word-processing application.

Defendants, in turn, contend that construction is necessary and propose "providing an opportunity to a first job applicant to author a resume employing a computer application which includes at least the following features: formatting, editing, and saving." Relying on the specification, they assert that generating a resume is an interactive process and that a word-processing application must have the capacity to format, create, edit, and save a document. The latter assertion is further bolstered by dictionary definitions. *See McGraw-Hill Dictionary of*

*Scientific & Technical Terms* 2175 (5th ed. 1994) (defining "word processing" as "[t]he use of computers and computerlike equipment to write, edit, and format text"); *Microsoft Computer Dictionary* 485 (4th ed. 1999) (noting that "[a]ll word processors offer at least limited facilities for document formatting, such as font changes, page layout, paragraph indentation, and the like" and defining "word processor" as "[a]n application program for creating and manipulating text-based documents").[6]

Defendants' proposal does not offer much greater clarity or understanding of the actual words of the claims. Defendants have not, for example, presented a convincing argument that a layperson would not comprehend the meaning of "word processing," such that it needs to be described by its functions. Also, replacing "permitting" with "providing an opportunity" appears to require some extra level of encouragement from the claimed invention that is not apparent in the patent itself. Again, the Court need not provide additional language construing a claim if its ordinary meaning can be readily understood by a layperson and adopting the original language would resolve the parties' dispute. *See O2 Micro*, 521 F.3d at 1361. Finding that to be the case here, the Court will construe the term "permitting a first job applicant to author a resume employing a word processing application" to have its plain and ordinary meaning.

**V.      Conclusion**

For the foregoing reasons, defendants' motion to strike is DENIED. The disputed claim terms are construed as follows:

---

[6] In supplemental briefing, plaintiff expressed the concern that defendants had argued for requiring that the job applicant create a resume "at a particular time"—immediately prior to conducting the remaining steps of the claimed invention—and at a "portal." (Pl. Supp. Mem. at 7-8). In response, defendants clarified that they meant only that the resume must be authored prior to transmission and that it did seek to add a "portal" limitation. Because there appears to be no real dispute between the parties, no construction relating to timing or location is needed.

1. the term "nonuniformly formatted source data streams" means "data streams that vary in format from one stream to the next," both where it appears in the body of the claims and where it appears in the preambles;

2. the term "source data string" means "a string of text from a source data stream";

3. the term "target data string" means "a string of text based on a source data string";

4. the term "extracting selected ones of said source data strings" means "identifying and isolating selected strings of text from a source data stream"; the phrase "extracting data strings" means "identifying and isolating strings of text"; and the phrase "extracting data strings from the received resume" means "identifying and isolating strings of text from the received resume";

5. the "enabling" step must precede the "storing" step;

6. the term "supplemental inquiry form" means "a form having fields for receiving data in addition to the data actually obtained from the source data stream"; and

7. the term "remote communication interface" means "one or more component(s) that can transfer data from a distance between two or more computers or computer systems."

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: November 12, 2014                    United States District Judge