# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KENEXA BRASSRING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 12-10943-FDS |
| | ) | |
| HIREABILITY.COM, LLC, | ) | |
| SAPIEN, LLC, HIREBRIDGE, LLC, | ) | |
| MAIN SEQUENCE TECHNOLOGY, INC., | ) | |
| QFETCH, LLC, and SENDOUTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER ON
## MOTION FOR JUDGMENT ON THE PLEADINGS

**SAYLOR, J.**

This is a patent dispute concerning systems and methods for facilitating the accurate transfer of information from individual users into a structured database—principally, transferring information from individual resumes to a hiring database. U.S. Patent No. 5,999,939 (the "'939 patent"), held by plaintiff Kenexa BrassRing, Inc., describes a "System and Method for Displaying and Entering Interactively Modified Stream Data into a Structured Form." U.S. Patent Nos. 6,996,561 (the "'561 patent") and 7,958,059 (the "'059 patent"), also held by Kenexa, each describe a "System and Method for Interactively Entering Data into a Database." Kenexa has brought suit for infringement of the three patents-in-suit, including allegations of willful infringement and a request for treble damages against three different entities: HireAbility.com, LLC; Main Sequence Technology, Inc.; and Sendouts, LLC. Defendants have asserted multiple defenses and counterclaims, including assertions of non-infringement and invalidity.

Defendants HireAbility and Main Sequence have moved for judgment on the pleadings, contending that the asserted claims in the patents-in-suit recite unpatentable subject matter under 35 U.S.C. §101 and are therefore invalid. For the reasons set forth below, the motion will be denied.

**I.  Background**

    **A.  Factual Background**

On October 19, 2004, the United States Patent and Trademark Office ("PTO") issued the '939 patent, which claims priority to a provisional application filed on December 21, 1997. On February 7, 2006, the PTO issued the '561 patent, which is a continuation of an abandoned application that was a continuation-in-part of the '939 patent. On June 7, 2011, the PTO issued the '059 patent, which is a continuation of the '561 patent. Each of the patents covers a "system and method for facilitating the accurate entry of information into a highly structured database by initially extracting information" from electronic sources and "subsequent interactions with users" and then "storing the accepted and/or modified information into the database." U.S. Patent No. 5,999,939, at [57] (filed Feb. 6, 1998); U.S. Patent No. 6,996,561, at [57] (filed Sep. 6, 2001); and U.S. Patent No. 7,958,059, at [57] (filed Jul. 28, 2005). Plaintiff Kenexa owns the '939, '561, and '059 patents.

Generally, the technology disclosed in the patents is intended for use in the processes of recruiting for and applying to jobs. For example, a job applicant could create and then submit a resume to the system, which would scan and select certain types of information (such as name, telephone number, and prior employer). The system would then present those selections to the job applicant to verify their accuracy or make alterations. In some instances, the system would

prompt the applicant to provide more information (for example, willingness to relocate, citizenship, or expected compensation). Finally, the system would store in a database all of the data that has been selected and verified, selected and modified, and added.

The three defendants sell allegedly infringing products and services. Hireability sells products and services under the name "ALEX"; defendant Main Sequence uses the name "PCRecruiter"; and defendant Sendouts uses "Recruiting Solutions" and "New Candidate Registration." Plaintiff alleges that ALEX, PCRecruiter, Recruiting Solutions, and New Candidate Registration infringe, or have infringed, the systems and methods in the '939, '561, and '059 patents. Plaintiff contends that defendants are liable not only for direct or indirect infringement, but also for actively inducing infringement and as contributory infringers.

B.     **Procedural Background**

Kenexa filed the present suit on May 25, 2012. HireAbility and Sendouts answered and filed counterclaims for invalidity and non-infringement on July 20 and October 22, 2012, respectively, and Main Sequence answered and filed counterclaims for invalidity on September 4, 2012.

On October 27, 2014, HireAbility and Main Sequence moved for judgment on the pleadings on invalidity grounds. Sendouts did not join the motion and has not moved separately for judgment on the pleadings.

On November 12, 2014, the Court issued an order on claim construction.[1]

---

[1] The Court construed the following six terms: "nonuniformly formatted source data streams"; "source data string"; "target data string"; "extracting selected ones of said source data strings"; "supplemental inquiry form"; and "remote communication interface." (Dkt. No. 249 at 34). The Court also clarified that "the 'enabling' step must precede the 'storing' step" as those steps relate to the patented systems and methods. (*Id.*).

## II. Legal Framework

### A. Legal Standard

A Rule 12(c) motion for judgment on the pleadings "is treated much like a Rule 12(b)(6) motion to dismiss." *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008). It differs from a Rule 12(b)(6) motion primarily because it is filed after the close of pleadings and "implicates the pleadings as a whole." *Aponte-Torres v. University of Puerto Rico*, 445 F.3d 50, 54-55 (1st Cir. 2006). To survive a motion for judgment on the pleadings, a plaintiff "must state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because a Rule 12(c) motion "calls for an assessment of the merits of the case at an embryonic stage, the court must view the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's behoof." *R.G. Financial Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).

Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008). Some courts have considered the issue of § 101 patentability at the pleadings stage. *See, e.g., McRO, Inc. v. Naughty Dog, Inc.*, 49 F. Supp. 3d 669 (C.D. Cal. 2014); *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 193-94 (S.D.N.Y. 2013). However, the Federal Circuit has cautioned that dismissal for lack of patentable subject matter at the pleading stage should be "the exception, not the rule." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338-39 (Fed. Cir. 2013) (*Ultramercial I*), *vacated on other grounds by WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014).

4

"[I]t will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter. This is so because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary." *Id.* at 1338. Thus, if unpatentability is raised as an affirmative defense under rule 12, "dismissal is appropriate only if the well-pleaded factual allegations in the complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense." *Id.* at 5-6.

### B. Statutory Framework

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101 (2010).[2] In choosing such broad categories of patent-eligible subject matter, Congress "plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).

Despite the relative breadth of patent-eligible subject matter, the Supreme Court has recognized a limited exception from patent eligibility for "laws of nature, natural phenomena, and abstract ideas." *See, e.g., Diamond v. Diehr*, 450 U.S. 175, 185 (1981). The exception is intended to prevent "monopolization" of "the basic tools of scientific and technological work," because patents covering such topics "might tend to impede innovation more than it would tend to promote it." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).

"The [Supreme] Court has recognized, however, that too broad an interpretation of this

---

[2] As set forth in §100(b), the term "process" means "process, art, or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."

exclusionary principle could eviscerate patent law." *Id.* at 1293. "[A]ll inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* While fundamental natural laws and abstract ideas cannot be protected by patents, "an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Diehr*, 450 U.S. at 187 (emphasis in original). The issues of novelty and obviousness do not bear on the question of subject-matter eligibility. *Diehr*, 450 U.S. at 188-89.

In *Mayo*, the Supreme Court "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2355 (2014) (citing *Mayo*, 132 S. Ct. at 1296-97). The first step is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* (citing *Mayo*, 132 S. Ct. at 1296-97). If it is, the court must then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297). This second step of the analysis involves a "search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (alteration in original) (quoting *Mayo*, 132 S. Ct. at 1294).

Although the Court has declined to "delimit the precise contours of the 'abstract ideas' category," it has established certain principles to guide the analysis of lower courts. *See Alice*, 134 S. Ct. at 2356-57. For example, a claim is not patentable if it "wholly pre-empt[s]" the use

of or "effectively grants a monopoly over" an abstract idea. *Gottschalk v. Benson*, 409 U.S. 63, 72 (1972); *Bilski v. Kappos*, 561 U.S. 593, 612 (2010). Instead, a patent-eligible claim must include elements that add "significantly more" to the basic principle. *Mayo*, 132 S. Ct. at 1294. Methods that "claim[] a mental process standing alone and untied to another category of statutory subject matter" are unpatentable, "even when a practical application [is] claimed." *In re Comiskey*, 554 F.3d 967, 980 (Fed. Cir. 2009). "The relevant inquiry is whether a claim, as a whole, includes *meaningful* limitations restricting it to an application, rather than merely an abstract idea." *Ultramercial I*, 722 F.3d at 1344. At the same time, the Federal Circuit has indicated that the

> disqualifying characteristic [of abstractness] should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act.

*Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010). A claimed invention must be considered as a whole, and "a new combination of steps may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diehr*, 450 U.S. at 188.

As for part two of the *Mayo* framework, "[s]imply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted) (emphasis in original). Similarly, "[t]he introduction of a computer into the claims does not alter the analysis at *Mayo* step two." *Id.*

Finally, in conducting the § 101 analysis, courts must take care not to interpret the statute "in ways that make patent eligibility 'depend simply on the draftsman's art' without reference to the 'principles underlying the prohibition against patents for natural laws.'" *Mayo Collaborative*

7

*Servs.*, 132 S. Ct. at 1294 (quoting *Parker v. Flook*, 437 U.S. 584, 593 (1978)). Thus, courts will not allow parties to circumvent the prohibition against patenting abstract ideas by limiting the use of their claim to a particular field, or by reciting insignificant post-solution limitations. *See Bilski*, 561 U.S. at 610-11; *Diehr*, 450 U.S. at 191-92.

## III. Analysis

### A. The Scope of the Record

Before evaluating the merits of defendants' motion, the Court must first clarify the record on which the motion will be considered. Plaintiff has submitted, as an exhibit to its opposition to the motion, a declaration by Dr. Michael D. Siegel as evidence supporting its opposition to the motion. Defendants have not moved to strike that declaration, but they have requested that it be disregarded.

Defendants correctly note that documents outside the pleadings are generally not considered in connection with a motion for judgment on the pleadings. *See Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007). Although the Court may, in its discretion, choose to consider other evidence at this stage, so doing would convert the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Gulf Coast Bank & Trust Co. v. Reder*, 355 F.3d 35, 38 (1st Cir. 2004).

Here, the Court will not exercise its discretion to convert defendants' motion into one for summary judgment. Accordingly, the declaration of Dr. Siegel will not be considered in connection with the motion for judgment on the pleadings.

### B. Applying the *Mayo* Framework

#### 1. Whether the Patents are Directed to an Abstract Idea

Under the two-part framework set forth by the Supreme Court in *Mayo* and *Alice*, the

first inquiry is whether the patents-in-suit are "directed to one of those patent-ineligible concepts." *Alice*, 134 S. Ct. at 2355; *see Mayo*, 132 S. Ct. at 1296-97. This first step has been described as "a sort of 'quick look' test, the purpose of which is to identify a risk of preemption and ineligibility." *Enfish, LLC v. Microsoft Corp.*, No. 2:12–cv–07360, 2014 WL 5661456, at *4 (C.D. Cal. November 3, 2014). With that in mind, courts applying the first step of the test typically have "recite[d] a claim's purpose at a reasonably high level of generality." *See id.*; *Alice*, 134 S. Ct. at 2355 ("intermediated settlement"); *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("data collection, recognition, and storage") *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014) (*Ultramercial II*) (holding that "the abstract idea at the heart of" the patent-in-suit was "that one can use [an] advertisement as an exchange or currency"); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 ("managing a game of Bingo"); *see also Bilski*, 561 U.S. at 612 ("hedging risk"); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) ("categorical data storage"). Application of the first *Mayo* step does not include a detailed examination of the asserted claims, either individually or as an "ordered combination"; that analysis is properly lodged within step two. *Alice*, 134 S. Ct. at 2356; *Mayo*, 132 S. Ct. at 1297.

Here, "the patents-in-suit are directed to systems and methods for transferring relatively unstructured electronic resume information of job applicants into a highly structured database that might be used by prospective employers." (Kenexa Claim Construction Br. at 1). In other words, the patented technology purportedly streamlines the job application process by extracting resume data (*e.g.*, name, address, prior experience, etc.) from non-uniformly formatted resumes and fitting it to the pre-set fields of an on-line form. It also allows job applicants to verify,

9

modify, and add data to the information displayed in the form fields before the form is transmitted to an employer.

Defendants contend that the relevant claims within the patents-in-suit "recite the abstract idea of taking information from a document (*e.g.*, a resume) and putting it into fields in a form (*e.g.*, a job application), presenting that form for review to ensure accuracy, allowing editing if inaccurate, occasionally asking for additional information from the user, and saving it in an organized database (*e.g.*, an alphabetized filing cabinet)." (Defs' Mem. at 1). They further contend that "[i]n principle, the claimed invention is the equivalent of the job application process that humans have performed for years." (*Id.*).

As evidenced by defendants' attempt to summarize the patents-in-suit, the claims here are not easily reduced to one succinct statement of an "abstract idea." In that respect, they appear dissimilar to the patents invalidated in cases like *Alice*, 134 S. Ct. at 2355 ("intermediated settlement") or *Bilski*, 561 U.S. at 612 ("hedging risk"). However, *Alice* made clear that the underlying principle behind both cases was that patents directed only to "organizing human activity" are invalid. *Alice*, 134 S. Ct. at 2356. That is precisely the apparent function of the patents-in-suit, which are directed toward streamlining the job-application process.

More specifically, the Federal Circuit has noted (since *Alice*) that "although there is no categorical business-method exception, claims directed to the mere formation and manipulation of economic relations may involve an abstract idea." *Content Extraction*, 776 F.3d at 1347 (citing *Bilski*, 561 U.S. at 606, 608; *Alice*, 134 S. Ct. at 2356-57). Further, courts both before and after *Alice* have invalidated patents directed toward solving related problems in the employment context. *See Walker Digital, LLC v. Google, Inc.*, No. 11-318, 2014 WL 4365245

10

(D. Del. Sep. 3, 2014) (invalidating patents directed to "facilitating an employment search . . . by controlling the release of confidential or sensitive information of at least one of the parties in establishing anonymous communications."); *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 200 (S.D.N.Y. 2013) ("computerized matchmaking in a business or enterprise context").

Considering the patents-in-suit in light of those precedents, they may be directed toward an abstract idea. However, because the Court determines below that defendants' motion must be denied under the second step of the *Mayo*/*Alice* analysis, it is not necessary to resolve the first step definitively at this stage.

## II. Whether the Patents Contain an "Inventive Concept"

The Supreme Court has described step two of the subject-matter eligibility analysis as "a search for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 132 S. Ct. at 2355 (internal quotation marks omitted). The purpose of this step of the analysis is to "distinguish between patents that claim the buildin[g] block[s] of human ingenuity and those that integrate the building blocks into something more." *Id.* at 2354 (internal quotation marks omitted). The former are ineligible for patent protection, because they "would risk disproportionately tying up the use of the underlying ideas"—in other words, pre-empting further developments within the field. *Id.* at 2354-55 (internal quotation marks omitted) (quoting *Mayo*, 132 S. Ct. at 1294).

In an attempt to demonstrate both the lack of inventiveness encompassed by, and the high risk of pre-emption posed by, the patents-in-suit, defendants provide five charts that purport to map the language of the disputed claims on to corresponding "routine business practices."

(Defs' Mem. at 11-16). According to defendants, the charts demonstrate that such business practices would be preempted by the patents-in-suit. (Defs' Mem. at 11 n.4). One such chart is reproduced below:

| Limitations of claim 1 of the '939 patent | Routine business practices | Routine business practices |
|---|---|---|
| supplying digital data representing each of a plurality of source data streams from a plurality of users, each said source data stream containing data corresponding to multiple discernible source data strings; | Bob, Steve and Betty fax or email his/her resume to Company Y's HR department. Their resumes include dates, addresses, education, experience, etc. Each resume varies from the other. | Bob, Steve and Betty fax or email his/her college application to Cornell. Their applications include name, address, education, experience, etc. Each application varies from the other. |
| processing said digital data for extracting selected ones of said source data strings and generating related target data strings | Company Y personnel takes each resume from a stack and uses the information from the resumes to fill in a job application. | Cornell admissions personnel takes the applications and uses the information to fill in an applicant profile to match potential roommates. |
| displaying a structured form comprised of multiple fields, each field being capable of accommodating a data string and wherein one or more of said fields have said target data strings inserted within; | Company Y personnel fills in the job application using information from the resumes; Company Y personnel populates the blanks on the job applications using information taken from the resumes. | Cornell admissions personnel fills in the applicant profile using information from the applications; admissions personnel populates the blanks in the profile using information taken from the applications. |
| enabling each user to modify and/or accept said target data strings inserted within said displayed form corresponding to said source data stream originating from said user; and | Company Y sends the filled-in job application back to the applicants so each can ensure the information is accurate. If the information is accurate, the applicant approves it; if the information is inaccurate, the job applicant corrects it; | Admissions sends the filled-in applicant profile back to the applicants so each can ensure the information is accurate. If the information is accurate, the applicant approves it; if the information is inaccurate, the applicant corrects it |
| storing data corresponding to said data strings from said form fields into a database. | Company Y stores the completed job applicant forms in its database. | Cornell stores the completed applicant profile in its 2019 student database. |

If defendants are correct (1) that the business practices detailed above can fairly be

12

characterized as "routine" (in that they have been and will continue to be performed regularly) and (2) that the corresponding claims would pre-empt their future practice, then a judgment of invalidity would likely be warranted. *See Alice*, 134 S. Ct. at 2354 ("[T]he concern that drives th[e] exclusionary principle [i]s one of pre-emption.").

However, at the pleading stage, the Court cannot simply assume that defendants' charts accurately reflect "routine" business practices. Furthermore, even if the Court could assume that businesses currently utilize such practices, it cannot assume that they were utilized at any point before the patents-in-suit were filed or issued.[3] Those are factual matters that cannot be resolved on a motion for judgment on the pleadings.

Likewise, the Court cannot assume that the claims detailed above would pre-empt the practices that are listed beside them. For example, the claims recite the use and processing of "digital data," but the business practices identified refer to humans receiving and processing forms that they have received by e-mail or fax. While those forms of communication do utilize "digital data," they produce output that is no longer in digital form. The claims at issue appear to be limited to a process that can be accomplished only by computers. In any event, whether the claims would pre-empt the "routine business practices" displayed in defendants' charts is, at least in part, a factual question that cannot be resolved at this stage.

Furthermore, the claims are not manifestly invalid for lack of inventiveness. Although simply reciting the use of "digital data," without more, would not be sufficient to satisfy the "inventive concept" requirement, *see id.* at 2358 ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."), the claims

---

[3] The '939 patent was filed in 1998; the '561 patent was filed in 2001; and the '059 patent was filed in 2005.

also recite a method of digital extraction—that is, isolating certain input information from a resume and transferring it to a particular field in a job-application form. Plaintiff contends that digital extraction is an advanced technique that "conventional" computers cannot perform, and thus goes beyond "requir[ing] a generic computer to perform generic computer functions." *See id.* at 2359. If plaintiff is correct, then the recitation of that technique could qualify as a "meaningful limitation" that goes "beyond generally linking the use of the [method] to a particular technological environment" and thus supplies an "inventive concept." *Id.* at 2360, 2357.[4] Plaintiff's characterization of the digital extraction technology may or may not be accurate; that determination cannot be made on the current record. The contention is sufficiently plausible, however, to withstand a challenge at this stage.

Accordingly, defendants have not put forth "clear and convincing evidence" that the patents-in-suit contain no limitations that are "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *See id.* at 2354-55; *Ultramercial I*, 722 F.3d at 1342. Thus, even if the Court were to assume that the patents-in-suit are drawn to an abstract idea (and it does not), defendants would still fail to meet the heavy burden that is required to support a finding of unpatentability at this stage. *See Card Verification Solutions, LLC v. Citigroup Inc.*, No. 13-C-6339, 2014 WL 4922524, at *2 (N.D. Ill. Sep. 29, 2014) ("[D]ismissal is appropriate solely when the only plausible reading of the patent is that there is clear and convincing evidence of ineligibility.") (citing *Ultramercial I*, 722 F.3d at 1339).

Accordingly, defendants' motion will be denied.

---

[4] Defendants' contention that digital extraction technology existed prior to the issuance of the patents-in-suit does not require a different result (and in any event is not supported by the current record); novelty is not a proper consideration in an evaluation of subject-matter eligibility under § 101. *Diehr*, 450 U.S. at 188-89.

## IV. Conclusion

For the foregoing reasons, defendants' motion for judgment on the pleadings is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: April 28, 2015                                United States District Judge